**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 19-1594

ANN FINCH, Individually and as Executrix of the Estate of Franklin Delenor Finch,

   Plaintiff - Appellee,

 v.

COVIL CORPORATION,

   Defendant - Appellant,

 and

BASF CATALYSTS LLC, Sued individually and as successor-in-interest to Engelhard, Pita Realty LTD., and Eastern Magnesia Talc Co.; DANIEL INTERNATIONAL CORPORATION, f/k/a Daniel Construction Company, Inc.; FLUOR CONSTRUCTORS INTERNATIONAL, f/k/a Fluor Corporation; FLUOR CONSTRUCTORS INTERNATIONAL, INC.; FLUOR DANIEL SERVICES CORPORATION; FLUOR ENTERPRISES, INC.; FOSTER WHEELER ENERGY CORPORATION; MCNEIL (OHIO) CORPORATION, INC.; MCNEIL & NRM, INC.; METROPOLITAN LIFE INSURANCE COMPANY; PFIZER, INC.; CRANE COMPANY; CBS CORPORATION, (a DE Corp) f/k/a Viacom Inc. (a PA Corp) (sued as successor-by-merger to CBS Corporation f/k/a Westinghouse Electric Corporation) and also as successor-in-interest to BF sturtevant; FLOWSERVE CORPORATION; FMC CORPORATION, individually and as successor in interest to Stearns Brakes; SWS SILICONES CORPORATION; WACKER CHEMICAL CORPORATION; RED SEAL ELECTRIC COMPANY; REXNORD INDUSTRIES, LLC,

   Defendants.

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro. Catherine C. Eagles, District Judge. (1:16-cv-01077-CCE-JEP)

Argued: May 27, 2020　　　　　　　　　　　　　　　　Decided: August 24, 2020

Before MOTZ and DIAZ, Circuit Judges, and Max O. COGBURN, Jr., United States District Judge for the Western District of North Carolina, sitting by designation.

Affirmed by published opinion. Judge Motz wrote the opinion, in which Judge Diaz and Judge Cogburn joined.

**ARGUED:** Allen Mattison Bogan, NELSON MULLINS RILEY & SCARBOROUGH LLP, Columbia, South Carolina, for Appellant. Lisa White Shirley, DEAN OMAR BRANHAM SHIRLEY, LLP, Dallas, Texas, for Appellee. **ON BRIEF:** C. Mitchell Brown, Blake T. Williams, NELSON MULLINS RILEY & SCARBOROUGH LLP, Columbia, South Carolina; Elbert Lin, HUNTON ANDREWS KURTH LLP, Richmond, Virginia; Leslie C. Packer, Raleigh, North Carolina, Curtis J. Shipley, ELLIS & WINTERS LLP, Greensboro, North Carolina, for Appellant. William M. Graham, WALLACE AND GRAHAM, P.A., Salisbury, North Carolina, for Appellee.

DIANA GRIBBON MOTZ, Circuit Judge:

On behalf of herself and the estate of her late husband, Ann Finch brought this wrongful death action against multiple defendants, contending they manufactured, installed, or supplied asbestos-containing products that caused his mesothelioma and resulting death. The jury found Covil Corporation, the only defendant that proceeded to trial, liable and awarded Mrs. Finch $32.7 million in compensatory damages. Covil now appeals, arguing that the district court erred in instructing the jury as to proximate cause and in refusing to reduce the damages award. We find no fault with the district court's careful jury instructions or its well-reasoned rationale for refusing to reduce the award. Accordingly, we must affirm.

I.

A.

From 1975 to 1995, Franklin Finch worked at the Firestone Tire Plant in Wilson, North Carolina. For all but eight months of his 20 years at Firestone, Mr. Finch's sole job was changing tires in the tire mold presses in the plant's curing room. The curing room contained about 120 steam-operated tire presses, each of which was connected to multiple steam pipes covered in asbestos-containing insulation. Mr. Finch's work operating the tire presses exposed him to asbestos dust from the presses themselves, which had internal components that released asbestos dust, and from the insulation on the steam pipes connected to the tire presses. It was undisputed that Covil did not supply the tire presses, but Mrs. Finch alleged that Covil had supplied the asbestos-containing insulation.

3

Prior to his death, Mr. Finch explained in deposition that, in performing duties in the curing room, he and others regularly walked on the steam pipe insulation, and that the insulation was regularly handled by mechanics repairing the steam pipes. Dr. Edwin Holstein, Mrs. Finch's witness and a physician qualified as an expert in both internal medicine and occupational and preventative medicine, testified without contradiction that this activity released asbestos dust into the air. As a result of the daily operation of the steam presses and the curing room operators and mechanics disturbing the insulation, Mr. Finch described the curing room as persistently hazy and dusty, like a "sandstorm." Dr. Holstein explained that this "sandstorm" was attributable in large part to insulation "being damaged or removed or replaced or being manipulated in one way or another, releasing asbestos into the air." Given that Mr. Finch had "daily occasions for breathing the dust from this, and over the course of time, this amounted to a substantial inhalation of asbestos."

Between his retirement from Firestone in 1995 and his diagnosis in 2016, Mr. Finch owned and operated a small landscape maintenance company, cutting grass for multiple buildings around town. Immediately prior to his diagnosis, Mr. Finch was "an unusually vigorous person for [a 78-year old]," and Dr. Holstein testified, again without contradiction, that he believed Mr. Finch's life expectancy without mesothelioma was "13 or 14 years."

In March 2016, suffering from significant weight gain and back pain, Mr. Finch sought medical attention. Doctors diagnosed him with mesothelioma of both the pleura (lung lining) and peritoneum (stomach lining), cancers that have a latency period of 30 to

4

50 years. Dr. Holstein testified that pleural mesothelioma is "one of the most painful cancers to have." In the eight months following his diagnosis, Mr. Finch required multiple lengthy hospitalizations and invasive surgeries in which 28 pounds of cancer and several organs, including his colon and spleen, were removed. The pain, nausea, vomiting, and need for a colostomy bag left Mr. Finch in agony. He died in January 2017, following what Dr. Holstein described in unrebutted testimony as a "terrible, terrible course."

B.

Mrs. Finch sued multiple corporate defendants; all but Covil settled before trial or prevailed on motions to dismiss or for summary judgment.[1] At trial, Mrs. Finch maintained that Covil negligently supplied the asbestos-containing steam pipe insulation to the Firestone plant that caused Mr. Finch's death. Her theory of the case was that Covil had supplied *all* of the steam pipe insulation in the Firestone plant when it was built in the early 1970s, including insulation in the plant's curing room, and that exposure to this asbestos-laden insulation was a substantial factor causing Mr. Finch's mesothelioma and resulting death. Covil did not contest that Mr. Finch was exposed to asbestos, that asbestos inhalation from occupational exposure at the Firestone plant caused his mesothelioma, or that mesothelioma caused his death. The primary dispute centered on whether Covil had supplied the asbestos-containing steam pipe insulation in the curing room.

To prove that Covil had done this, Mrs. Finch offered documentary evidence from Firestone that Covil supplied all of the insulation in the Firestone plant — "miles of

---

[1] The district court granted summary judgment to Covil as to some of the claims against it but denied summary judgment as to others.

5

insulation" used in the plant's construction, including in the curing room where Mr. Finch worked. When the Firestone plant was remediated for asbestos in 1990, approximately 7,000 feet of asbestos-containing insulation was removed from the curing room, and that material had been in place since the plant's construction in the early 1970s. Mrs. Finch offered an invoice from Covil billing Firestone for 711 feet of asbestos-containing material installed in the plant. And she pointed to unrefuted testimonial and documentary evidence that, contrary to Covil's claims, the company did not stop supplying asbestos-containing material until well after the Firestone plant was built. Based on this evidence, Mrs. Finch argued that it was reasonable to conclude that Covil had supplied the asbestos-containing steam pipe insulation that Mr. Finch had worked around on a daily basis for twenty years, and that this insulation was a proximate cause of Mr. Finch's mesothelioma and eventual death.

Faced with this evidence, Covil relied on a scattershot defense. The company suggested that asbestos within the tire presses — undisputedly not supplied by Covil — was the sole cause of Mr. Finch's mesothelioma. Covil also maintained that it did not supply the asbestos-containing insulation in the curing room. The company did not deny that it supplied *some* asbestos-containing pipe insulation to the Firestone plant or that it supplied significant amounts of steam pipe insulation to that plant, but maintained that it had primarily supplied asbestos-free insulation, as it assertedly stopped selling asbestos-containing insulation prior to that plant's construction. Thus, according to Covil, most of the insulation it supplied was asbestos-free, and the asbestos-containing insulation in the curing room was attributable to another company. As to the 711 feet of asbestos-containing

6

steam pipe insulation the company had to admit it supplied to the plant, Covil argued that it was impossible to determine where in the plant that insulation was located, and that consequently Mrs. Finch could not prove that Mr. Finch was exposed to *this particular* 711 feet of insulation.

After a five-day trial, the jury found for Mrs. Finch and awarded $32.7 million in compensatory damages. Covil subsequently moved to renew its motion for judgment as a matter of law or, in the alternative, for a new trial or new trial nisi remittitur. Following extensive post-trial briefing and argument, the district court ruled that Covil was entitled to a setoff for Mrs. Finch's pre-trial settlements with other defendants and denied all other relief sought by Covil. Covil timely noted this appeal. The company asserts that the district court (1) erred in its jury instruction and (2) abused its discretion in refusing to reduce the damages award. We consider each argument in turn.

II.

Covil first contends that the district court's jury instruction on substantial factor causation impermissibly reduced Mrs. Finch's evidentiary burden. We review the content of jury instructions for abuse of discretion. *United States ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 382 (4th Cir. 2015). In considering the language of a specific instruction, we ask "whether the instructions construed as a whole, and in light of the whole record, adequately informed the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the objecting party." *Spell v. McDaniel*, 824 F.2d 1380, 1395 (4th Cir. 1987).

7

North Carolina law requires a plaintiff in a tort action prove that exposure to a defendant's product was a substantial factor causing the plaintiff's injury. *See, e.g.*, *Seraj v. Duberman*, 789 S.E. 2d 551, 557–58 (N.C. App. 2016). Covil maintains that in *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156, 1162 (4th Cir. 1986), this court articulated a jury instruction that must be repeated verbatim in instructing a jury as to substantial factor causation in any case concerning diseases caused by asbestos. In *Lohrmann*, we explained that "[t]o support a reasonable inference of substantial causation from circumstantial evidence, there must be evidence of exposure to a specific product on a regular basis over some extended period of time in proximity to where the plaintiff actually worked." *Id.* at 1162–63. We elaborated that, "[i]n effect, this is a *de minimis* rule since a plaintiff must prove more than a casual or minimum contact with the product." *Id.* at 1162.

Covil would turn our discussion in the *Lohrmann* opinion into a jury instruction that must be supplied in all asbestos-related cases. But "[a]ppellate opinions are not jury instructions, nor are they meant to be." *Noel v. Artson*, 641 F.3d 580, 588 (4th Cir. 2011). As we have explained:

> [J]ury instructions articulate general principles of law that decide cases. Of course appellate opinions may guide a district judge's discretion in formulating jury instructions, or even bear upon the formation of pattern instructions. But they are by no means intended to preempt a district judge's discretion to formulate a suitable charge for a specific trial.

*Id.* Like the district court, we reject the notion, advanced by Covil, that *Lohrmann* must be parroted in the court's jury instruction. Rather, *Lohrmann* sets forth what a plaintiff has to show to establish substantial factor causation: more than *de minimis* exposure to a

8

defendant's products, by proving that the plaintiff was regularly and frequently in proximity to the defendant's product. The instruction must convey these principles, but it need not do so using exactly the language articulated in *Lohrmann*.

Both parties and the district court agreed that the principles articulated in *Lohrmann* applied in this case. Resp. Br. at 15. Thus, the parties accepted that Mrs. Finch had to demonstrate that Mr. Finch was regularly in close contact with insulation supplied by Covil. The parties disagreed, however, on the language necessary to explain this level of exposure to the jury. The question before us, then, is not whether *Lohrmann* applies, but whether this jury instruction adequately conveyed its principles.

The district court instructed the jury as follows:

> Ms. Finch must prove, by the greater weight of the evidence, only that Covil's negligence was a proximate cause of Mr. Finch's mesothelioma and death. So in evaluating proximate cause, you are specifically evaluating whether Mr. Finch was exposed to asbestos-containing insulation sold by Covil to such an extent that it is reasonable to infer and find by the greater weight of the evidence that Covil's insulation was a substantial factor in contributing to Mr. Finch's development of mesothelioma . . . . You should consider how much Covil insulation was in the plant, what portion of that insulation contained asbestos, how closely Mr. Finch worked around the places where the Covil asbestos-containing insulation was, the amount of dust from Covil asbestos-containing insulation products, how long Mr. Finch worked in the plant, and other relevant evidence about exposure to asbestos-containing products sold by Covil.

Covil complains that this instruction omitted the frequency and regularity components discussed in *Lohrmann*, and as such did not instruct the jury to determine whether there was more than *de minimis* exposure to asbestos-containing pipe insulation "sold by Covil." In particular, Covil believes that while the charge asked the jury to consider whether Mr. Finch worked around asbestos insulation "sold by Covil" at some point in time, it did

9

not require the jury to consider *how often* Mr. Finch worked near asbestos-containing insulation "sold by Covil."

We disagree. The detailed instruction at issue here gave proper guidance to the jury to determine whether Covil's insulation constituted a substantial factor in Mr. Finch's mesothelioma, and it embodies the "general principles of law" set forth by *Lohrmann*. It required the jury to consider how much asbestos-containing insulation "sold by Covil" was in close proximity to Mr. Finch's daily work, whether this insulation actually created significant amounts of asbestos dust, and how long Mr. Finch worked at the plant. In short, the district court required the jury to consider how often Mr. Finch was around asbestos-containing insulation "sold by Covil," and how much exposure to asbestos was attributable to this insulation. The challenged instruction permitted the jury to find for Mrs. Finch only if she proved that Mr. Finch had more than *de minimis* exposure to asbestos-containing insulation "sold by Covil," and left Covil's "counsel more than enough room to argue the facts in light of this standard." *Noel*, 641 F.3d at 587. Thus, the court did not err in providing the challenged instruction.[2]

---

[2] As the court detailed, asbestos exposure can result in two distinct diseases: asbestosis and mesothelioma. Greater exposure to asbestos is required to contract asbestosis as compared with mesothelioma. Therefore, an evidentiary instruction on asbestosis theoretically requires proof of greater exposure than mesothelioma. The district court reasoned in the alternative that it was not required to invoke *Lohrmann* explicitly because, "[t]o the extent the [c]ourt did not use *Lohrmann*'s exact language, the differences were warranted by differences between the diseases at issue [asbestosis in *Lohrmann* and mesothelioma in *Finch*] and the evidence." We need not reach this consideration because the instruction given in this case clearly comports with *Lohrmann*, regardless of the disease.

10

III.

Covil directs its only other challenge to the district court's refusal to reduce the amount of damages the jury awarded. We again review for abuse of discretion. *See Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc.*, 99 F.3d 587, 593–94 (4th Cir. 1996). In our review, "we give the benefit of every doubt to the judgment of the trial judge." *Fontenot v. Taser Int'l, Inc.*, 736 F.3d 318, 334 (4th Cir. 2014) (internal quotation marks omitted).

A.

Covil first asserts that "*Erie* principles mandate a comparative review of damages awards in diversity cases." Opening Br. at 31. The company insists that the district court necessarily abused its discretion by failing to engage in this purportedly required comparative analysis.

This argument turns on its head the Supreme Court's unambiguous direction that the determination of whether a jury's award is excessive is a matter of state substantive law. *See Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 429–31 (1996). Recognizing that "a statutory cap on damages would supply substantive law for *Erie* purposes" because it would set the bounds of a plaintiff's possible recovery, *id.* at 428–29, the Court reasoned that a state law prohibiting jury verdicts that "deviate materially from what would be reasonable compensation" was no different, *id.* at 425, 430–31. Conversely, of course, a district court sitting in diversity must abide by a state's choice not to impose such a requirement. As *Gasperini* further explained, although an appellate court reviews the district court's decision for abuse of discretion, in this assessment, the appellate court, too,

11

"must be guided by the damage-control standard," or lack thereof, that "state law supplies." *Id.* at 438; *see also Fontenot*, 736 F.3d at 334 ("In a diversity action, federal courts apply state law standards in considering whether the district court abused its discretion when ruling on a motion relating to a jury's damages award.").

Notwithstanding that the Supreme Court and our court have been clear that state law provides the substantive standard, Covil maintains that our decision in *Steinke v. Beach Bungee, Inc.*, 105 F.3d 192 (4th Cir. 1997), created a rule of *federal* procedural law that district courts sitting in diversity must engage in a verdict comparison analysis to facilitate appellate review for abuse of discretion. This argument presumes that without such a comparative analysis, a reviewing court cannot determine whether the district court abused its discretion. We have grave doubts that *Steinke* so held. For starters, that opinion thoroughly and correctly explained *Gasperini*, which seems at the very least in considerable tension with Covil's argument. Moreover, in *Steinke* we remanded the award not because the district court failed to engage in a comparative award analysis, but because it denied the defendant's motion without a single word of explanation, leaving us unable to determine the basis for the denial. 105 F.3d at 197.

In any event, we need not definitively resolve whether *Steinke* adopted a new federal procedural requirement because Covil did not raise this argument before the district court. "Absent exceptional circumstances" that Covil does not assert are present here, "we do not consider issues raised for the first time on appeal." *Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co.*, 386 F.3d 581, 603 (4th Cir. 2004). Covil does not deny that it did not argue before the district court that federal procedural law required a verdict comparison.

12

Instead, it maintains that this argument was fairly encompassed in its request that the district court compare awards. Rep. Br. at 10. We disagree. Before the district court, Covil consistently argued that comparison was warranted and permissible *under state law*. But at no point did the company intimate that *federal law* mandated a verdict comparison.[3] Covil thus waived the argument.

B.

We turn to whether the district court abused its discretion in determining that the verdict was not excessive as a matter of law. North Carolina law provides that a trial court may order a new trial if the verdict appears to be "given under the influence of passion or prejudice." N.C. R. Civ. P. 59(a)(6). Covil maintains that the size of the verdict here was so large that it constitutes prima facie evidence of passion or prejudice. It marshals two primary supporting arguments: that opposing counsel made an improperly prejudicial closing argument, in effect impermissibly asking the jury to punish Covil, and that the damages were so speculative that they were necessarily based on the jury's passion or prejudice.

As the district court recognized, in determining whether a damages award is due to the influence of passion or prejudice, under North Carolina law a trial court must consider

---

[3] It is not as though the excessiveness issue was considered only in passing. The district court put significant thought into the question of how to determine whether the verdict was excessive, and explicitly solicited the parties' advice on how it should analyze excessiveness. Given the opportunity, both in briefing and at the hearing, to air its position, Covil persistently extolled the merits of a comparative approach, but agreed that state substantive law supplied the standard and never once mentioned federal law. Having not raised this argument below, the district court had no occasion to consider it.

13

the entirety of the evidence presented at trial. *See Guox v. Satterly*, 596 S.E.2d 452, 454–55 (N.C. App. 2004). Moreover, North Carolina law is also clear that the size of the award, standing alone, is not evidence of passion or prejudice. *See Everhart v. O'Charley's, Inc.*, 683 S.E.2d 728, 742 (N.C. App. 2009). With these principles in mind, we review for abuse of discretion the district court's conclusion that (i) Covil did not meet its burden of proving that opposing counsel's statements improperly prejudiced the jury; and (ii) the trial evidence provided a basis for the jury's award.

i.

Covil first argues that counsel for Mrs. Finch "gave an incendiary closing argument" that "excoriat[ed] Covil over matters relevant only to punitive damage awards" not at issue in this case. Opening Br. at 14, 41. In particular, Covil maintains that Mrs. Finch's counsel encouraged the jury to consider Covil's motives as well as conduct unrelated to the question of the company's negligence, both improper bases for compensatory damages.

For example, Covil complains that Mrs. Finch's counsel smeared the company as a bad actor by asserting that it had destroyed records. But, as the district court explained, this argument was not improperly prejudicial. Rather, "this was a permissible inference from the evidence." *Finch v. Covil Corp.*, 388 F. Supp. 3d 593, 615 (M.D.N.C. 2019). Covil maintained that it could not produce records related to its insulation sales to the Firestone plant because they burned in a warehouse fire; yet Firestone's records indicated that sales to Firestone occurred the year *following* the fire and were shipped from a Covil warehouse *not* impacted by that fire. The district court concluded that Mrs. Finch offered this information not to suggest that Covil was a bad actor deserving of punishment, but "to

14

provide context for why the plaintiff had not proffered more robust documentary evidence, and to address Covil's contention that the absence of documentary evidence meant the plaintiff could not prove her case." *Id.* at 615. The district court similarly rejected Covil's assertions that other statements were unfairly prejudicial, explaining that either Covil's characterizations of Mrs. Finch's argument were "inaccurate," or the statements themselves were "not improper" or "could not rationally have caused prejudice to Covil." *Id.* We need not recount the entirety of the district court's opinion; suffice it to say that, having independently reviewed the trial record, including the 100-page transcript of Mrs. Finch's closing argument, we see no error in the district court's conclusions.

ii.

Covil alternatively claims that the evidence did not support the large award of compensatory damages, raising an inference that passion or prejudice motivated the award.

The North Carolina wrongful death statute allows recovery for pain and suffering of the decedent, as well as the "present monetary value of the decedent to the persons entitled to receive the damages recovered" because of his death. N.C. Gen. Stat. § 28A-18-2(b)(2), (4). The present monetary value of the decedent is not limited to "income-focused measure[s] of damages," but allows recovery for the services, society, and companionship of the decedent, including decedents who may not produce an income, like "a child, homemaker or handicapped person." *DiDonato v. Wortman*, 358 S.E.2d 489, 492 (N.C. 1987).

Although a plaintiff may recover for the present value of a decedent's services without reference to income, the Supreme Court of North Carolina has been clear that

15

damages pursuant to section 28A-18-2(b)(4) must still be "proved to a reasonable level of certainty" rather than being "based on pure conjecture," lest the statute become punitive in effect. *Id.* at 493. In so holding, the *DiDonato* Court provided some assistance to courts struggling to ensure plaintiffs prove the non-pecuniary value of the decedent's services, care, and companionship provided because, by their nature, such services have no readily ascertainable dollar value.

*DiDonato* held that loss of services and companionship, while permissible bases for recovery under North Carolina law, are unavailable in a suit for the wrongful death of a stillborn child. This is so because "we simply cannot know anything about its personality and other traits relevant to what kind of companion it might have been and what kind of services it might have provided. An award of damages covering these kinds of losses would necessarily be based on speculation rather than reason." *Id.* at 494. This analysis indicates that the loss of services and companionship need not have a readily ascertainable pecuniary value. Rather, in assessing these damages, a jury may take "personality and other traits" into consideration. *DiDonato* thus teaches that there is a difference between an unrecoverable *speculative* loss — that is, one without a basis in the evidence — and a loss that is merely difficult to quantify. North Carolina law forbids speculative damages, but damages that are difficult to quantify are squarely within the province of the jury. Thus, as the district court recognized, North Carolina courts have directed that "the assessment of [wrongful death] damages must, to a large extent, be left to the good sense and fair judgment of the jury." *Brown v. Moore*, 213 S.E.2d 342, 348 (N.C. 1975).

16

In this case, without a more specific jury form, we cannot know what portion of the jury's award was attributable to Mr. Finch's pain and suffering (it may have constituted the bulk of the award) and what portion was compensation for the value of Mr. Finch's companionship and services to his family. Regardless, Mrs. Finch offered reasonable certainty on both.

While valuing Mr. Finch's pain and suffering required the jury to quantify intangible losses, there was nothing speculative about the existence or magnitude of his pain and suffering. Mrs. Finch offered extensive, uncontroverted evidence as to her husband's pain and suffering, which included enduring eight months of what Dr. Holstein testified (without rebuttal) was one of the most painful cancers that exists due to its impact on a part of the body dense in nerve endings. Moreover, the jury heard testimony (again, unrebutted) that, over eight months, Mr. Finch was hospitalized for multiple operations, necessitating extended hospital stays; had several liters of fluid removed from his lungs and 28 pounds of cancer removed from his body; and lost his spleen, his colon, most of his rectum, and part of his intestines, requiring Mr. Finch to carry a colostomy bag that severely limited his daily activities. In addition, the jury learned that, following his first surgery, Mr. Finch could no longer participate in activities that gave him joy and meaning, including spending time with his family and attending church.

Given the uncontested evidence regarding the course of Mr. Finch's illness and attendant complications, we cannot say that Mr. Finch's physical and psychological suffering from his disease was speculative. The district court further recognized that expert opinion could not have ascertained a more determinate value for Mr. Finch's pain and

17

suffering and that "golden rule" evidence would have been improper. *Finch*, 388 F. Supp. 3d at 626. The court concluded: "The fact that there was no evidence placing a dollar amount on Mr. Finch's pain and suffering does not undermine the compelling and uncontradicted evidence that his pain and suffering were substantial." *Id.* We agree. That some amount of the jury's award in this case was based on intangible pain and suffering does not make it speculative.

The district court also rejected Covil's suggestion that evidence of the monetary value of Mr. Finch to his family was minimal or speculative, noting that the evidence about Mr. Finch's deep and loving relationship with his family was "similarly compelling and uncontradicted." *Id.* at 626. The court recounted the active role Mr. Finch played in the lives of his adult children and his grandchildren, whom he saw on at least a weekly basis. *Id.* Mrs. Finch testified that they had a very close marriage, that they were "[a]lways" in close physical proximity, and that he left love notes for her around the house. *Id.* at 627. In short, Mrs. Finch (and Mr. Finch's daughter, who also testified) offered uncontested evidence about the depth of the relationships he had with his family. The district court concluded that, despite the difficulty in precisely calculating the value of Mr. Finch's "society, companionship, comfort, guidance, kindly offices and advice," N.C. Gen. Stat. § 28A-18-2(b)(4), the evidence of the "substantial value" of Mr. Finch to his family was "compelling." *Finch*, 388 F. Supp. 3d at 628. We agree that Mrs. Finch has satisfied what North Carolina law requires.

We do not suggest that the jury's award was *the only* amount that could have compensated Mrs. Finch and the estate for the damages proved in this case. Even

18

accounting for the uncontested evidence demonstrating the length and intensity of Mr. Finch's suffering and the gravity of his family's loss, the award is undeniably significant. But, having read and considered the entire trial record, we are struck by the lack of any inflammatory argument by Mrs. Finch's counsel, the absence of any contrary evidence on many now contested issues, and the district court's care throughout the trial and post-trial proceedings, including its thoughtful consideration of, and ultimate rationale for rejecting, Covil's attack on the size of the damages award. Without evidence of passion or prejudice, we cannot replace the jury's considered judgment with our own, or with an amount that Covil would prefer.

## IV.

For the foregoing reasons, we conclude that the district court did not err in instructing the jury or in upholding the damages the jury awarded.[4] The judgment of the district court is therefore

*AFIRMED.*

---

[4] Consequently, as Covil concedes, Rep. Br. at 26 n.8, we need not reach its argument that the district court erred in denying its renewed motion for judgment as a matter of law as to Mrs. Finch's failure-to-warn claim.